Estate of B. H. Kroger, Deceased, Chester F. Kroger, Irving W. Pettengill, Rudolph Homan and The Provident Savings Bank and Trust Company, Executors v. Commissioner.
Estate of Kroger v. Commissioner
Docket No. 201.
United States Tax Court
1943 Tax Ct. Memo LEXIS 151; 2 T.C.M. (CCH) 644; T.C.M. (RIA) 43392; August 17, 1943
*151 Oscar Stoehr, Esq., St. Paul Bldg., Cincinnati, Ohio, Ike Lanier, Esq., 522 Dixie Terminal Bldg., Cincinnati, Ohio, Elden McFarland, Esq., 618 Southern Bldg., Washington, D.C., and C. Chester Guy, Esq., for the petitioners. John H. Pigg, Esq., and DeWitt M. Evans, Esq., for the respondent. SMITH Memorandum Findings of Fact and Opinion SMITH, Judge: This proceeding is for the redetermination of a deficiency in estate tax of $12,524,987.81. Several of the issues presented have been settled by stipulation of the parties. They have agreed that the extent of the deductions to which petitioners are entitled, on account of additional executors' fees, attorneys' fees and administration expenses, may be established by appropriate evidence to be submitted by petitioners at the time or in connection with the Rule 50 settlement of this case, and that the extent to which petitioners may be entitled to an additional credit for estate, inheritance, legacy or succession tax may be established in accordance with the statute and regulations applicable thereto. The remaining issues are: (1) Should there be included in the gross estate of the decedent as transfers in contemplation of death within the *152 meaning of section 302 (c) of the Revenue Act of 1926, as amended, the value at the date of death: (a) of certain property transferred by decedent to a trust created on January 21, 1928; (b) of certain property transferred by him as gifts to his children on January 31, 1928; and (c) of certain property transferred by him to two separate trusts created on February 13, 1928? (2) Should there be included in the gross estate of the decedent as transfers intended to take effect in possession or enjoyment at or after death within the meaning of section 302 (c) of the Revenue Act of 1926, as amended, the value at the time of death of the property transferred to the two trusts created on February 13, 1928? (3) Did the respondent err in including in the gross estate of the decedent the fair market value at the time of his death of the corpora of the two trusts created on February 13, 1928? (4) Did the respondent err in including in the gross estate of the decedent the value of the corpora of the two trusts created on February 13, 1928, as they existed at the time of decedent's death rather than the value of the property transferred by decedent at the time of the creation thereof? Findings *153 of Fact The stipulations of fact, together with all the exhibits received in evidence, are made a part of our findings of fact by reference. The decedent was born January 24, 1860, at Cincinnati, Ohio, where he resided continuously thereafter until his death. He died July 21, 1938, at Wianno, Cape Cod, Mass. The petitioners Chester F. Kroger, Irving W. Pettengill, Rudolph Homan and The Provident Savings Bank and Trust Co., of Cincinnati, Ohio, are the duly appointed, qualified and acting executors of the last will and testament of the decedent. The estate tax return for decedent's estate was timely made to the collector for the first district of Ohio disclosing a gross and net estate of $11,158,515.59 and $10,453,292.38, respectively, upon which an estate tax in the amount of $4,151,179.11 was duly assessed and paid. At an early age the decedent engaged in the grocery business in the City of Cincinnati. This business prospered and was incorporated under the name of Kroger Grocery & Baking Co. in 1902, at which time it became the owner and operator of 30 stores. The business continued to grow and expand until about 6,000 stores were operafed. Until the sale of his entire stockholdings *154 in January, 1928, decedent was at all times the principal stockholder in, and a director and president of, that company. Negotiations for the sale of decedent's entire stockholdings in the Kroger Grocery & Baking Co. began near the end of 1927, and resulted in a sale by him of his said stockholdings for a cash consideration of $24,397,000. This amount was received in January, 1928. The decedent sold his stock because the price offered was so much in excess of what he considered its real value that he could not afford to refuse it. With the accumulation of a fortune as a result of the successful operation of the Kroger Grocery & Baking Co. the decedent became a substantial stockholder in and a member of the board of directors of The Provident Savings Bank and Trust Co., Cincinnati, Ohio, and in 1901 became president of that institution. In 1926 he was appointed a member of the board of directors of the Federal Reserve Bank of Cincinnati, and continued as such until 1936. In 1932 he became a member of the board of directors of the First National Bank of Palm Beach, Florida, and in 1936 was elected chairman of the board of directors, which office he held at the time of his death. *155 To decedent's first marriage there were born six children, namely, Gertrude, Lucile I., Bernard Henry, Jr., Helen, Chester F., and Gretchen, all of whom were living in January and February, 1928. Decedent's wife died on April 22, 1899, and he did not thereafter remary until March 3, 1928, when he was married to Mrs. Alice Farrington Maher at his winter home at Palm Beach, Florida. On or about January 21, 1928, the decedent as donor created a trust naming his sons, B. H. Kroger, Jr., and Chester F. Kroger, and his daughter, Lucile I. Kroger Berne, as trustees, to which he transferred certain assets. Under the terms of the trust instrument the entire net income of the trust was payable in stated portions to Mary Kroger Kuhlman, Emma Kuhlman DeGarmo, Ida Coleman Snyder, Fannie Jansen Quehl, Helen Jansen Rover, and Gertrude Kuhlman. The trust corpus was distributable to the beneficiaries to the extent of the designated interest of each during her life, in the discretion of the trustees; with further provisions for distribution to designated beneficiaries if not so distributed. All of the beneficiaries of this trust were relatives of decedent by blood or marriage, but were not his heirs *156 or lineal descendants. Prior to January 21, 1928, the decedent had contributed from time to time to the support of the beneficiaries named in the above referred to trust instrument and had paid their extraordinary expenses, such as doctors' and hospital bills. None of the income from this trust was payable to or for the use of the donor nor did the donor retain any reversionary interest, contingent, or otherwise, in the trust corpus, or any power of revocation. The trust was created by decedent in order that the beneficiaries might have a steady income and that the decedent might be relieved from further personal appeals for aid. On or about January 31, 1928, the decedent made a gift of $1,000,000 par value United States Treasury notes to each of his six children. Decedent's son, B. H. Kroger, Jr., died intestate without issue on June 4, 1933; whereupon, pursuant to the laws of the State of Ohio, decedent acquired by inheritance all of the property, both real and personal, of which B. H. Kroger, Jr., died seized or possessed, including the property represented by the gift of $1,000,000 to him on January 31, 1928, as aforesaid. Decedent's daughter, Lucile I. Kroger Berne, died *157 on December 15, 1932, her husband and children surviving her. The decedent made the above referred to gifts to his children in order that they might receive training and experience in the handling of money, live comfortably and educate their children, and because decedent wanted to see them enjoy the money while they were young. On February 13, 1928, decedent, as donor, entered into a trust agreement naming The Provident Savings Bank and Trust Co., of Cincinnati, as trustee and transferred to it, in trust, $2,000,000 par value United States Treasury notes. Under the terms of this trust agreement the trust was required to pay the entire net income from the trust to the donor for life; and upon the donor's death pay such net income to his surviving children in equal shares, and to the issue of any deceased child per stirpes. Upon the death of the survivor of the donor's children, the corpus of the trust is to be distributed in equal shares to the surviving grandchildren of the donor, and per stirpes to the issue of any deceased grandchild. The trust instrument provided in part: SECOND: The trustee is hereby authorized and empowered from time to time to sell the securities or other *158 property, whether real or personal, constituting this trust or any part thereof upon the instructions in writing or with the consent in writing of the donor during his life. * * * The said trustee is hereby authorized and empowered subject to provisions aforesaid for obtaining instructions and for consultation to invest and reinvest in stocks of seasoned [corporations], other securities, or real estate as it may deem to the best interest of the estate, and donor hereby purposes to relieve the said trustee from the necessity of making investments and reinvestments in such securities or property only as are provided by statute or rules of chancery courts as proper investments for trust funds. On the same date (February 13, 1928) the decedent, as donor, entered into another trust agreement naming his daughter, Lucile I. Kroger Berne, and his sons, Chester F. Kroger and B. H. Kroger, Jr., as trustees, and transferred to them in trust certain assets consisting of $10,000,000 par value United States Treasury notes. Under the terms of this trust agreement, as in the case of the $2,000,000 trust, the trustees were required to pay the entire net income of the trust to the donor for life, *159 and thereafter until the death of the survivor of the donor's children to the same beneficiaries and in the same proportions as in the case of the $2,000,000 trust. Upon the death of the survivor of the donor's children the corpus of the trust is to be distributed in equal shares to the surviving grandchildren of the grantor and per stirpes to the issue of any deceased grandchild. In neither of the trust instruments of February 13, 1928, did the decedent retain any reversionary interest whatsoever (either contingent or otherwise), in the corpus of the trust. He retained the trust income for life because he desired to have the income for his own use. In neither trust instrument did he retain any power of revocation or amendment. The two trust instruments of February 13, 1928, were drafted under the following circumstances: The decedent, as had been his custom for many years, had gone to Palm Beach, Florida, in November or December, 1927, for the winter season. In the latter part of January, 1928, he invited his son, Chester, and his son's wife, to visit him at his home in Palm Beach. They accepted the invitation. Upon Chester's arrival decedent told him that he was planning *160 to remarry; that he did not want the bulk of his estate to go to his intended wife; that he wanted his children and his own blood grandchildren to have the benefit of it; and that he proposed to execute a prenuptial agreement to accomplish his purpose. Chester did not like the idea of a prenuptial agreement fearing that it might eventually lead to litigation. After consultation with Leo J. Van Lahr, who happened to be in Palm Beach at the time, Chester suggested to his father that he create an irrevocable trust of a part of his estate in lieu of the proposed prenuptial agreement. Van Lahr was president of The Provident Savings Bank and Trust Co., of Cincinnati, of which bank decedent was then chairman of the board. After several days of consultation with Chester, the decedent decided to create two trusts in lieu of the prenuptial agreement. Chester never mentioned or suggested to his father any purpose or object in creating the trusts except as a substitute for the proposed prenuptial agreement. Decedent decided on two trusts, instead of one, because he wanted to give the bank some of the business. Harley S. Hamilton, an attorney connected with the Trust Department of the bank, was *161 called from Cincinnati to draft the trust instruments. He went to West Palm Beach and drafted the instruments upon instructions from Chester as to irrevocability, as to trustees, and as to the disposition of the income, etc. Hamilton did not see or talk with the decedent until at the time the trust instruments were signed. He received no instructions or advice as to the powers to be possessed by the trustees or as to any reservation of powers by the grantor; and the trust provisions covering these powers were such as are usually and ordinarily inserted for the protection of a trustee, and to facilitate the handling of property of the trust. When the trust instruments were drafted and presented to the decedent he did not at once sign them. He demurred because he was not at once ready to surrender control of so large a portion of his fortune. Finally, on February 13, 1928, in the presence of R. D. Taylor, who was a notary public, Harley S. Hamilton, and Chester Kroger, the decedent executed the trust instrument. Neither the subject of taxation nor of the tax effects of the trusts was ever mentioned by the decedent or by his son, Chester, in his conference with decedent, nor by Hamilton *162 or Chester Kroger in the preparation of the trust instruments. At the time the decedent signed the two trust instruments, however, Hamilton volunteered the information to the decedent that the trusts would have no effect of any kind on his taxes, either income or estate. He was at the time cognizant of the decision of the District Court in the case of , decided January 12, 1928, and was of the opinion that where a person created a trust, retaining the income for life, the value of the trust corpus at the date of his death was includible in his gross estate. Decedent was married to Mrs. Alice Farrington Maher at Palm Beach, Florida, on March 3, 1928. At the time of the creation of the trust of January 21, 1928, at the time of the gifts of January 31, 1928, and at the time of the creation of the two trusts on February 13, 1928, the decedent was in good health. His health had been good for many years prior thereto and continued so for many years thereafter. He was subject to frequent colds but never was confined to bed with any ailment, except for a few days with a quinsy sore throat in the fall of 1927, until he was taken *163 ill in 1937. Decedent was an inveterate golfer. He played 18 holes of golf almost daily from 1913 to 1933 while in Cincinnati; he also played golf daily, weather permitting, on his summer vacations. On his winter vacations in Florida, prior to 1920 up to the winter of 1937 and 1938, the decedent played golf almost daily, weather permitting. His usual daily routine in Florida was to rise at seven, shave himself, eat breakfast, drive to the golf course, play golf, then take a swim and have lunch, play bridge in the afternoon, drive home to dinner, and go to a show in the evening. After his marriage in 1928 he usually attended some social gathering in the evenings, or entertained friends at home. At the time of decedent's death in 1938 there were outstanding 20 standard form policies of insurance on decedent's life totaling $403,000. All except two fraternal policies required physical examination as a prequisite to their issuance. Three of these policies (two for $25,000 each and one for $10,000) had been issued in 1925, when decedent was 65 years of age. These policies had been issued after medical examination at the standard insurance rates applicable to selected insurance risks. *164 In 1925 the decedent's life expectancy was 10.5 years. He outlived that life expectancy by 2 1/2 years. Immediately following decedent's marriage on March 3, 1928, he and his bride motored to the west coast of Florida on a honeymoon trip, decedent, as was his custom, driving the automobile. In May, 1928, decedent returned to Cincinnati where he remained until August 9, 1928. On August 2, 1928, he obtained reservations for a European trip with his bride. On August 4, 1928, he executed his last will and testament under the provisions of which, after providing for the payment of his debts and disposing of his household goods, it was provided in substance that: First, one-third of all the rest, residue and remainder of decedent's estate was given, devised and bequeathed to The Provident Savings Bank and Trust Co., its successor and successors, in trust, the entire net income from which was payable to decedent's wife for life, should she survive him. Upon the death of his wife, the entire principal of this trust was distributable by the trustee in accordance with the last will and testament of his wife, or, in the event his wife should die intestate, the principal of said trust was to *165 be distributed in like manner as the rest and residue of his estate. It was also provided that, in the event his wife should elect to take under the statutes, she should have out of decedent's estate only such amount as provided by the statutes. Second, a specific bequest of $500,000, in trust, for the purpose of establishing a foundation to be known as The B. H. Kroger Foundation, the same to be administered by the trustees for educational, charitable, philanthropic and humanitarian purposes. Third, all the rest and residue of his estate, the decedent gave, devised and bequeathed to his children living at the time of his death, and to the issue, per stirpes, of a deceased child. On August 9, 1928, decedent and his bride left for Europe. They traveled extensively in Germany and visited Italy, France and England, returning to Cincinnati early in November, 1928. In November, 1937, decedent went to Florida for the winter. Soon after reaching Florida he was taken ill and was confined to his bed. He attended a birthday party, however, given in his honor by his children and grandchildren at Palm Beach on January 24, 1938. He returned to Cincinnati in May, 1938, and on June 18 left *166 for Wianno, Cape Cod, Mass., where he had rented a house for the summer. He was taken ill on July 18, 1938, and died two days later at Wianno. The cause of decedent's death was congestive heart failure, secondary to hyperthyroidia, hypertension, arteriosclerosis. Decedent had had a substernal goitre ever since his boyhood. It was nontoxic and gave him no trouble. The ear, nose and throat specialist who had the decedent in his private hospital because of an attack of quinsy in the fall of 1927 was not aware of the existence of the goitre. In 1927 or 1928, a physician of Cincinnati, who had attended the decedent for chronic constipation, advised the removal of the goitre. The decedent stated, however, that it gave him no trouble, that he had had it all his life and intended to keep it. It gradually increased in size after 1930 and may have become toxic before his death. The creation of the trust of January 21, 1928, and the contemporaneous transfer of property to it, and the gifts of $1,000,000 to each of his six children on January 31, 1928, were not made in contemplation of death and were not a part of decedent's gross estate. The creation of the two trusts of February 13, 1928, *167 and the contemporaneous transfer of $12,000,000 to the trustees were for the purpose of barring his wife from any statutory rights in the transferred property in case the woman whom he was about to marry should survive him and were made in contemplation of death. Opinion The question for decision is whether there should be included in the gross estate of the decedent, who died July 21, 1938, the following transfers of property: Transfers
Value
1. January 21, 1928, Trust
$ 148,870.15
2. Gifts to children on January 31,
1928 (Treasury Notes)
5,000,000.00
3. $2,000,000 Trust February 13,
1928
1,736,414.24
4. $10,000,000 Trust February 13,
1928
10,461,490.16
The estate tax return filed by the petitioners showed a gross estate of $11,158,515.59 and a net estate of $10,453,292.38. In his determination of the deficiency the respondent increased the gross and net estate to $29,135,110.52 and $28,455,379.33 by including therein the above-described transfers and by other minor adjustments not presently in issue. The reasons for including the transferred property in the gross estate are stated by the respondent in his deficiency notice as follows: It has been determined *168 that the trusts created by decedent on January 21, 1928, and February 13, 1928, and the gifts to the decedent's children on or about January 31, 1928, constitute transfers made in contemplation of death within the meaning of Section 302 (c) of the Revenue Act of 1926, as amended; that the trusts dated February 13, 1928, were made to take effect in possession and enjoyment at or after death within the meaning of Section 302 (c) of the Revenue Act of 1926, as amended; and that decedent possessed such ownership of the corpus of the trusts dated February 13, 1928, as to make the entire corpus of said trusts a part of the gross estate under Section 302 (a) of the Revenue Act of 1926, as amended. The applicable statute is the Revenue Act of 1926, as amended by the Revenue Act of 1932, and the Revenue Act of 1934, the pertinent provisions of which are as follows: Sec. 302. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real estate situated outside the United States - (a) To the extent of the interest therein of the decedent at the time *169 of his death; * * * * *
(c) To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, or of which he has at any time made a transfer, by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (1) the possession or enjoyment of, or the right to the income from, the property, or (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom; except in case of a bona fide sale for an adequate and full consideration in money or money's worth. * * * Section 302 (c) of the Revenue Act of 1926, before amendment, and in effect in 1928, reads in material part as follows: (c) To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, except in case of a bona fide *170 sale for an adequate and full consideration in money or money's worth. * * * As above indicated, the respondent in his deficiency notice gives as one reason for including in the decedent's gross estate the properties transferred to the two trusts of February 13, 1928, "that decedent possessed such ownership of the corpus of the trusts dated February 13, 1928, as to make the entire corpus of said trusts a part of the gross estate under Section 302 (a) of the Revenue Act of 1926, as amended." In his brief the respondent says "that the value of the securities so transferred in trust is includible in the gross estate by reason of the broad economic control retained by decedent over the trust corpora." We do not think that there is any sound basis for his contention. It clearly was the intention of the decedent by the creation of the two trusts of February 13, 1928, and the transfer of Treasury notes of a par value of $12,000,000 thereto divest himself of the ownership of that property. He wanted to put that property out of his estate so that the woman whom he was proposing to marry should not have any rights in respect of it in case she survived him. Clearly the legal title to the property *171 was in the trustees from the date the Treasury notes were transferred to them. It is true that the decedent provided that the trustees should not sell assets of the trusts except upon his prior written consent; it was also understood by all parties that while the decedent lived he should be consulted with respect to any change of investments. But his right did not give him any title to the property which survived him and which passed from him on his death. The estate tax is a form of death duty. . It is an excise tax upon property which passes by reason of death and is thus distinguished from a succession tax. ; . Since the decedent's title to the Treasury notes passed to the trustees on February 13, 1928, and since thereafter the decedent had only a life interest in the income therefrom which ceased upon his death, it necessarily follows, we think, that no part of the value of those Treasury notes or property into which they might be transferred by the trustees is includible in the gross *172 estate under section 302 (a). An exception to the general rule that inter vivos gifts of property are not subject to estate tax has long been recognized. Where a gift or transfer of property has been made in contemplation of death or is intended to take effect in possession or enjoyment at or after death, the value of such property at the date of death may properly be included in the gross estate for the purpose of the assessment of a death duty. Manifestly, if this were not so death duties could largely be avoided, for persons near death could make inter vivos gifts of their property to those whom they wished to have it after death, which would defeat the tax. Section 302 (c) of the Revenue Act of 1926 was drafted to prevent such an avoidance. Property which is transferred "in contemplation of death" or "is intended to take effect in possession or enjoyment at or after death" is to be included in the gross estate. The two phrases are included in the same category. But it does not follow that they have the same connotation. Clearly they do not. A person may make an inter vivos gift of his property in contemplation of death which may take effect instanter. Nevertheless, *173 if the gift is made for the purpose of avoiding the death duty, or is induced by the thought of death, it must be included in the gross estate. On the other hand, a person may give property to "B" to deliver to "C" upon the donor's death. In such case the property is includible in the gross estate, because the gift is intended to take effect in possession or enjoyment at or after death. In , the Supreme Court said: "The words 'in contemplation of death' mean that the thought of death is the impelling cause of the transfer." It further said: "There is no escape from the necessity of carefully scrutinizing the circumstances of each case to detect the dominant motive of the donor in the light of his bodily and mental condition, and thus to give effect to the manifest purpose of the statute." What was the "dominant motive" of the decedent in the making of the transfers which are here in controversy? In 1928 the decedent was 68 years of age. His health was good. He had never had any serious illness. He had had frequent colds, a fact which was presumably one reason for his spending the winter seasons in Florida. In the *174 fall of 1927 he had an attack of quinsy sore threat and the ear, nose, and throat specialist whom he consulted put him in his private hospital until the abscess was ready to lance. He quickly recovered. He had a slight enlargement of the thyroid gland. It was so slight in 1927 that the ear, nose and throat specialist who treated him did not note it. Another physician whom he consulted on one or two occasions for minor illnesses in 1927 or 1928 advised him to have it operated upon but decedent said he had had it all of his life and that he was going to keep it. That the decedent enjoyed good health in 1928, and for many years prior thereto and thereafter, is shown by the fact that he was an inveterate golfer and was in the habit of playing 18 holes of golf for exercise day after day. He enjoyed being with his friends and was of a cheerful frame of mind. The evidence does not warrant a finding that the transfers of property made by the decedent in January and February, 1928, were motivated to any extent because of a concern for his health. The evidence furthermore shows that none of the transfers was made with any purpose of avoiding income tax or to save his estate the payment *175 of estate taxes. The respondent asks us to find that the transfers to the trusts made on January 21, 1928, and February 13, 1928, and of the gifts of January 31, 1928, were a "part of a comprehensive plan embracing the entire estate of the decedent, including the making of the will on August 4, 1928." Such a finding of fact cannot be made. There is no evidence that at the time the transfers were made the decedent contemplated making a will. In August, 1928, he was about to take an extended European trip with his bride. He made his will at that time. We can not see that the making of the will was in any wise connected with the transfers made in January and February. A large part of the decedent's fortune came to him in the form of cash in January, 1928. He received during that month cash from the sale of his stock in Kroger Grocery & Baking Co. in the amount of $24,397,000. This was far in excess of his needs. He did not actively contemplate using this money in any new business which might be taken up by him. On many different occasions in past years the decedent had aided his sister and some other relatives in the payment of doctors' bills, hospital bills, etc. In January, 1928, *176 he was in possession of cash which enabled him to make satisfactory provision for continuing the aid which he had given to them in the past. His son testified that his father told him that "He created this trust in order to be relieved of personal contact in a great many cases in the making of or contributing to the support of these beneficiaries." From the date of the creation of the trust and the transfer of property to it the income of the trust was to be used for the beneficiaries. The trust principal was only about $150,000. We cannot see how or wherein the creation of this trust was in any wise connected with the gifts made to his children on January 31, 1928, or the creation of the two trusts and transfers of property to the trustees on February 13, 1928. In our opinion the evidence overcomes the presumption of the correctness of the respondent's determination that the transfer of property to the trust of January 21, 1928, was made in contemplation of death. In January, 1928, the decedent had six living children. All of them were of age and some of them had families of their own. The decedent made a gift to each on January 31, 1928, of $1,000,000. His daughter, Gertrude Kroger *177 Pettengill, testified that the decedent told her shortly after the gifts were made that "he had given us [children] the money because he wanted us to learn how to take care of money. He wanted to help us do it. We were to feel free at any time to come to him for advice as to investments or anything of that sort." Another daughter, Mrs. Rudolph Homan, testified that: "he said he was delighted to give us the money because he wanted to have us enjoy the money while we were young and he wanted us to be able to educate our children and he just loved to see us enjoy it." A friend of the decedent's, Graham P. Hunt, testified: "he told me that he made those gifts to his children in order to see how well they handled money, that he rather expected a difference in that management among the children." In , it was said: * * * As illustrating transfers found to be related to purposes associated with life, rather than with the distribution of property in anticipation of death, the Government mentions transfers made "for the purpose of relieving the donor of the cares of management or in order-that his children may experience the responsibilities *178 of business under his guidance and supervision." The illustrations are useful but not exhaustive. The purposes which may be served by gifts are of great variety. It is common knowledge that a frequent inducement is not only the desire to be relieved of responsibilities, but to have children, or others who may be the appropriate objects of the donor's bounty, independently established with competencies of their own, without being compelled to await the death of the donor and without particular consideration of that event. There may be the desire to recognize special needs or exigencies or to discharge moral obligations. The gratification of such desires may be a more compelling motive than any thought of death. It seems to us that the testimony of the witnesses quoted above points to the fact that the gifts to the children were related to purposes associated with life. The decedent wanted his children to have money enough to permit them to live in the manner in which they had been accustomed to live over a period of years without his doling the money out to them year by year. Furthermore, he wanted to accustom them to the making of investments for themselves. The evidence, in our *179 opinion, overcomes the presumption of the correctness of the respondent's determination that these gifts were made in contemplation of death. We next consider whether the trusts created on February 13, 1928, with contemporaneous transfers of $12,000,000 Treasury notes to the trustees in trust were made in contemplation of death. What was the "dominant motive" of the decedent in making such transfers? We do not think that the decedent had any concern relative to his health that prompted him to make the transfers. He was contemplating marriage, not death. Marriage is associated with life. The decedent's son, Chester F. Kroger, testified in part: * * * Later on after that [the making of a gift of $1,000,000 to each of his children] my father asked me to come to Palm Beach, Florida, and at that time he told me he planned to remarry. He asked me what I thought about it. I said, "That is for you to decide." He said, "What will your sisters think about it?" I said, "I don't know. I think they should feel the same way I do." He said, "That's all right. I would like to make prenuptial agreement with Alice." I said, "What do you want to do that for?" His answer was that he did not want the *180 bulk of his estate to go to her. He wanted his own children to have the benefit of it and his own blood grandchildren to have the benefit of it. It struck me that the prenuptial agreement did not amount to much. It looked like a proposition to get father for a lot of lawsuits, so Mr. Van Lahr [president of The Provident Savings Bank and Trust Co., of Cincinnati, who was wintering at Palm Beach at the time] - I went to him and told him about this plan. He suggested we make an irrevocable trust for this large amount of money. I went back to my father and told him about it. At that time we really went into it. It took me about seven days to convince him that was the proper way to handle it. We called up Harley Hamilton [attorney for The Provident Savings Bank and Trust Co., of Cincinnati] and told him to come to Florida. We spent about one week drawing up these drafts. After that it took me three or four days to get the old man to sign it. His greatest fear seemed to be at the time that he was irrevocably giving away money and had nothing to say about it. * * * It seems clear from the above referred to testimony that the "dominant motive" of the decedent in the creation of the two trusts *181 of February 13, 1928, and of the transfers of the $12,000,000 Treasury notes to the trustees was to bar his future wife from any statutory rights of dower which she might have in his estate, if she should survive him. He could reasonably expect that she would for she was much younger than he was. This was made apparent from the showing of moving pictures of the decedent and his wife at the time of the hearing of this proceeding, which pictures showed the couple after the wedding ceremony and later. As is shown by the testimony of Chester, his father did not want his future wife to share with his children in the bulk of his fortune. Manifestly, the decedent was thinking of death at the time, for if he was to outlive his wife his estate would not be diminished by his marriage. In section 81.16 of Regulations 105 the Commissioner has provided that "a transfer is prompted by the thought of death if it is made with the purpose of avoiding the tax." See also ; ; certiorari denied . If a transfer *182 made to avoid estate tax is in contemplation of death, on a parity of reasoning a transfer made to bar a future wife from dower is made in contemplation of death. We are of the opinion that the respondent did not err in including in the gross estate the value of the property transferred to the two trusts created February 13, 1928. The respondent argues that since the decedent retained the income for life of the two trusts created February 13, 1928, the value of the transferred property is includible in the gross estate under the rule of . The transfers were made, however, prior to the amendment of section 302 (c) of the Revenue Act of 1926 by the Joint Resolution of March 3, 1931, and under the principle of , that amendment is not to be given a retroactive effect. Furthermore, in , we have held that the principle of , is not overruled by In view of our conclusion that *183 the transfers to the above referred to trusts of February 13, 1938, should be included in the gross estate as having been made in contemplation of death, it is unnecessary to consider whether they should be included in the gross estate as transfers of property "intended to take effect in possession or enjoyment at or after death." The final contention of the petitioners is that the value of the trust corpora, even if includible in decedent's gross estate, cannot be in excess of the value at the time of decedent's death of the assets transferred by decedent to the trusts. The petitioners submit that in valuing the assets of these two trusts the respondent did not determine the value of the assets transferred by the decedent to the trusts but valued substituted assets of the trusts on hand at the date of decedent's death. We are of the opinion that there is no merit in this contention. The estate tax is imposed upon the value of the net estate as it exists at the date of the death of the decedent. If the decedent had made an inter vivos gift of property in contemplation of death that property would have to be valued as of the date of death whether that value be more or less than *184 at the date of the gift; and if property has been converted into other property the value of such other property at the date of death is the measure of the tax. The same rule applies where property is transferred to a trust in contemplation of death. Petitioners make the further contention that the extent of the decedent's interest in the $12,000,000 par value of Treasury notes transferred to the two trusts on February 13, 1928, did not exceed 70 per cent of the fair market value thereof. The argument is that the transferred property includible in the gross estate is simply the remaindermen's interest in that property as at the date of the transfer; that since the grantor retained a life interest in the transferred property the value of that life interest as at the date of the transfer is to be deducted from the total value of the transferred property at the date of death. In support of this contention the petitioners cite . In that case the Court of Claims held that where trust property was includible in settlor's gross estate for estate tax purposes, because of *185 settlor's reversionary interest, the values at date of settlor's death of the already vested interests of the trust beneficiaries should be deducted and excluded from the gross estate. We do not think that the principle of that case has application here; for the decedent retained no reversionary interest in the trusts. What the decedent transferred to the two trusts on February 13, 1928, were Treasury notes of a face value of $12,000,000. It was either those Treasury notes or substituted assets which constituted the corpora of the trust at the date of the death of the decedent. The value of the transferred property at the date of death was not lessened by the fact that the decedent retained the income from the trusts for life, and it is the date of death which is the date for valuation. We are of the opinion that the respondent did not err in including in the gross and net estates of the decedent the full value of the corpora of the two trusts as at the date of death. Decision will be entered under Rule 50.